UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Brian Douglas McCurdy,

      Petitioner,

v.                              Case No. 11-10972

Princess Roseanne Shreve-McCurdy,      Honorable Sean F. Cox

      Respondent.

_____/

## OPINION

      Petitioner filed this action against Respondent on March 11, 2011, seeking immediate return of the couple's minor child to Canada, under the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq.* Petitioner contends that Respondent's removal and retention of the child in the United States is wrongful under the Hague Convention because Canada was the site of the child's habitual residence prior to the time of the removal and retention, and he seeks an order returning the child to Canada. This Court held an evidentiary hearing on April 14, 2011. For the reasons that follow, the Court shall GRANT the petition.

## BACKGROUND

      Petitioner Brian McCurdy ("Brian") filed this action against Respondent Princess Shreve-McCurdy ("Princess") on March 11, 2011. Brian brought this petition seeking immediate return

of the couple's minor child, BJM,[1] to Canada, under the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq*.  Brian contends that Respondent's removal and retention of BJM is wrongful under the Hague Convention because Canada was the site of BJM's habitual residence prior to the removal and retention, and seeks an order returning BJM to Canada.

The Court initially scheduled an evidentiary hearing for April 7, 2011.  On April 5, 2011, Counsel for Respondent filed her Answer to the Petition and requested an adjournment of the evidentiary hearing.

On April 6, 2011, this Court held a Status Conference.  At that conference, the parties agreed that an evidentiary hearing is needed so that this Court can hear and determine the contested issues in this case.  The Court rescheduled the evidentiary hearing for April 14, 2011, to allow Respondent's counsel time to prepare for the hearing.  The Court further ordered the parties to file witness lists, exhibit lists, and exchange exhibits prior to the hearing.  (Docket Entry No. 18).

DISCUSSION

The Hague Convention seeks to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." *Maynard v. Maynard*, 484 F.Supp.2d 654, 658 (E.D. Mich. 2007).  A "primary purpose of the Convention is to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court." *Friedrich*

---

[1]To protect the identity of the child, pursuant to FED. R. CIV. P. 5.2, the Court refers to Petitioner and Respondent's minor child as BJM.

2

*v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993).

"When faced with a petition for return of a child under the Hague Convention, the courts of signatory nations may only determine the merits of the abduction claim; the merits of the underlying custody claim are not to be considered." *Robert v. Tesson*, 507 F.3d 981, 988 (6th Cir. 2007).

Under the Hague Convention, as implemented by the United States Congress in the International Child Abduction Remedies Act, children who are wrongfully removed or retained within the meaning of the convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies.  Under Article 3 the Convention, the removal of a child from one county to another is wrongful when:

> a) it is a breach of the rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal of retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in subparagraph a above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of agreement having legal effect under the law of that state.

Hague Convention, Article 3; *see also Friedrich*, 983 F.3d at 1400.

The Petitioner has the burden of showing by a preponderance of the evidence that the removal was wrongful.  *Friedrich,* 983 F.3d at 1400.

If the Petitioner meets that burden, the burden shifts to the Respondent to show that one of the following narrow exceptions applies such that the child should not be returned:

> 1)      that the removal proceeding was commenced more than one year after the removal and the child has become settled in the new environment.  Hague

3

Convention, Article 12;

2)      the Petitioner had consented or acquiesced in the removal or retention.
        Hague Convention, Article 13a;

3)      there is a grave risk that return of the child would expose the child to
        physical or psychological harm.  Hague Convention, Article 13b;

4)      returning the child would violate fundamental principles relating to the
        protection of human rights and fundamental freedoms.  Hague
        Convention, Article 13b; or

5)      the child objects to being returned and has attained an age and degree of
        maturity at which it is appropriate to take account of his or her views.
        Hague Convention, Article 13b.

Hague Convention, Articles 12, 13a, and 13b; *Friedrich*, 983 F.3d at 1400.  The second defense

listed above – that the Petitioner consented or acquiesced to the removal or retention – must be

proven by a preponderance of the evidence.

## EVIDENTIARY HEARING

This Court held an evidentiary hearing on April 14, 2011 to hear and determine the

following contested issues in this matter: 1) whether Canada was BJM's habitual residence prior

to the alleged removal and retention; and 2) if so, whether Respondent can establish that Brian

consented to or subsequently acquiesced in the removal or retention.

Brian called the following witnesses at the hearing: 1) Brian; and 2) Linda McCurdy.

Brian also presented several exhibits at the hearing.

Princess called the following witnesses at the hearing: 1) Princess; 2) Brian McCurdy, Jr.;

and 3) Laura Lee.  Princess presented several exhibits at the hearing.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having heard and observed the witnesses who testified at the evidentiary hearing,

4

allowing for this Court to assess credibility, having considered the exhibits submitted by the parties, having considered the arguments presented by counsel, and having applied the governing legal principles, the Court makes the following findings of fact and conclusions of law.[2]

FINDINGS OF FACT

On April 12, 2011, the parties filed a Joint Stipulation of Facts. (Docket Entry No. 27). The Court will identify all stipulated facts as such below.

After consideration of the testimony and exhibits presented at the evidentiary hearing, drawing inferences as appropriate, weighing the evidence and assessing the credibility of the witnesses, the Court finds as follows.

Brian is 43 years old. (Stipulated Facts at ¶ 1). Princess is also 43 years old. (Stipulated Facts at ¶ 2). Brian and Princess have two children together: 1) Brian McCurdy, Jr., who is currently 18 years old and resides with his mother in Southfield, Michigan; and 2) BJM, who was born in 2004 and is currently six years old. (Stipulated Facts at ¶ 4). Princess also has an adult daughter named Lutece Shreve.

Brian currently resides at 450 Superior, LaSalle, Ontario Canada N9H 0A3 ("the 450 Superior Residence"), with his sister, Linda McCurdy ("Linda"), and her minor son, LM. (Stipulated Facts at ¶ 5). Brian has dual citizenship in the United States and Canada.

Princess currently resides in Southfield, Michigan, along with Brian McCurdy, Jr. Princess is a licenced registered nurse in both Canada and Michigan.

BJM was born in Canada in 2004. Following her birth, Brian and Princess resided

_____

[2]To the extent that a finding of fact is more properly a conclusion of law, and the to the extent that a conclusion of law is more properly a finding of fact, it should be so construed.

5

together with BJM in LaSalle, Ontario Canada for a short period of time.  At that time, they

resided at the 450 Superior Residence, with Brian's sister Linda.

Brian, Princess and BJM later moved to Detroit, Michigan, where they resided with

Princess's sister Laura Lee and her husband, until August of 2005.

In August of 2005, the couple and BJM moved to Flatrock, Michigan.  Brian and Princess

were married on April 20, 2006.  (Stipulated Facts at ¶ 3).  As of 2007, however, the couple's

relationship was deteriorating.

In July or August of 2007, the couple separated and Brian returned to LaSalle, Ontario

Canada.  Brian and Princess agreed that BJM would reside with Brian at the 450 Superior

Residence and attend school in LaSalle the following year.  At this time, Brian was still in the

process of obtaining his masters degree at Michigan State University.

In the fall of 2008, Brian had an internship position that required him to temporarily

reside in California.  In the fall of that same year, Princess's mother was diagnosed with terminal

cancer.  After the diagnosis, Princess cared for her ill mother and, as a result, was unable to care

for BJM on a full-time basis.  At that time, Brian, Princess, and Linda agreed that BJM would

reside at the 450 Superior Residence in LaSalle and attend school in LaSalle.

On October of 2008, Brian, Princess, and Linda executed a written "Parenting

Agreement" wherein they all agreed that Brian, Princess, and Linda would have joint custody of

BJM and that BJM "shall have her primary residence in the home of the Aunt at 450 Superior

Street LaSalle, Ontario."  (Pet.'s Ex. 2).  That agreement further provided that Linda "shall have

the authority to make inquiries and decisions concerning the health, education and welfare of the

child.  Specifically, the Aunt shall have the authority to enroll the child in school in LaSalle."

6

(*Id*.).   The parties entered in to that written agreement so that Linda would be able to enroll BJM in school in LaSalle.

The 2008-2009 School Year:

Linda was able to enroll BJM in school in LaSalle.  On November 3, 2008, BJM was registered in junior kindergarten at Sandwich West Public School in LaSalle, Ontario Canada. (Stipulated Facts at ¶ 7).  BJM attended the remainder of that school year at Sandwich West Public School, while residing at the 450 Superior Residence.

Princess's mother passed away in December of 2008.

Once the school year ended, BJM spent the summer months (mid-June 2009 through the end of August, 2009), with Princess in Michigan.

The 2009-2010 School Year:

In September of 2009, BJM returned to LaSalle.  From September 8, 2009 to June 30, 2010, BJM was registered in senior kindergarten at Sandwich West Public School in Canada. (Stipulated Facts at ¶ 8).  BJM attended the entire school year at Sandwich West Public School, while residing with Brian and Linda at the 450 Superior Residence.

Towards the end of the 2009-2010 school year, Princess told Brian that she wanted BJM to come live with her in Michigan and the couple argued about her request.  Brian expressed that he wanted BJM to remain with him during the school years, at least until the couple's older son graduated from high school.  Brian wanted his son to be able to get through his senior year of high school without having to baby-sit and care for his sister while his mother was working. Although Brian understood that Princess wanted BJM to come to Michigan to attend first grade at Laurus Academy, Brian did not agree or consent to that.

In June, 2010, BJM came to Michigan to stay with her mother. When BJM left Canada for the summer, she did not take her personal belongings with her to Michigan.  That is, her toys and the majority of her clothes remained in her bedroom at the 450 Superior Residence.

Before leaving to visit her mother for the summer, BJM participated in tryouts in order to be on the cheerleading squad again for the 2010-2011 school year and ordered a uniform.

In August of 2010, Princess called Brian and asked for BJM's vaccination records.  Brian believed that Princess wanted those records so that she could enroll BJM in first grade in Michigan and he did not give her the records.  In August of 2010, Brian first consulted a lawyer to advise him about his custody rights.

The 2010-2011 School Year:

BJM returned to the 450 Superior Residence on September 3, 2010.  From September 3, 2010 to September 7, 2010, BJM was in Canada with Brian.  (Stipulated Facts at ¶ 10).

On September 7, 2010, BJM was registered in grade 1 at Sandwich West Public School in Canada.  (Stipulated Facts at ¶ 11).  On September 7, 2010, Brian took BJM to school for her first day of first grade at Sandwich West Public School.  Later that evening, however, Princess came to the 450 Superior Residence and took BJM back to Michigan without Brian's consent.

On September 8, 2010, Princess registered BJM in grade 1 at Laurus Academy in Southfield, Michigan.  (Stipulated Facts at ¶ 12).  BJM began attending Laurus Academy on September 8, 2010.

After Princess took BJM to the United States on September 7, 2010, Brian sought legal advice on how to obtain a custody determination through the appropriate legal channels.

On November 11, 2010, Princess brought BJM back to Canada so that BJM could receive

8

medical treatment.  Because the child was ill and could not return to school, and Princess was working full-time, Princess returned BJM to the 450 Superior Residence and asked that Brian care for BJM.

Princess asked that Brian return BJM to her in Michigan on November 14, 2010, but Brian did not do so.

On November 18, 2010, Brian filed an Application for Custody in the Ontario Court of Justice.  (Stipulated Facts at ¶ 14).

As of November 21, 2010, BJM was still in Canada with Brian, residing at the 450 Superior Residence.  Princess and Brian McCurdy Jr. went to the 450 Superior Residence on November 21, 2010.  At that time, Brian stated that he would not let Princess take BJM to Michigan.  Both Brian and Princess were upset and argued with each other.  Linda, who is an attorney in Canada, was also present at the home and served Princess with legal documents from the custody action in the Ontario Court of Justice.  Princess then left the house and returned to the United States without BJM.

Princess read the documents that she was served with on November 21, 2010, and understood that Brian had initiated custody proceedings in Canada.

On November 22, 2010, Brian re-enrolled BJM at Sandwich West Public School, so that she could go back to school there.   On November 24, 2010, Brian picked BJM up from school and dropped her off at his sister's house, Cheryl McCurdy-Ducre, to play with BJM's cousins.

On November 24, 2010, Princess traveled to LaSalle in order to get BJM and bring her to the United States.  Princess drove to Canada with her adult daughter, Lutece Shreve, her sister, Laura Lee, and a friend, Tammy Biddles.  The group knew that BJM was at Brian's sister's house

9

and drove to the house.  Because Princess knew that they would not let her in the house if she came to the door, Princess told her daughter Lutece to go in the house and get BJM. Lutece left the house with BJM, and brought BJM to the car where Princess and the others were waiting. Neither Princess nor Lutece told Brian or his family members that they were taking BJM from the house or that they were taking BJM to the United States.

Princess testified that she obtained BJM from Brian's sister's house in the manner that she did because she knew that Brian would not agree to let BJM leave the country with her.

Upon learning that Princess had taken BJM, Brian immediately contacted border control, to try to prevent Princess from taking BJM across the United States-Canadian border.  Brian also went to the LaSalle police station on November 24, 2010 and told the LaSalle police that BJM had been removed from Canada by Princess without his consent.

After returning to the United States with BJM on November 24, 2010, Princess then stayed at a friend's house for a period of approximately two weeks and did not inform Brian where they were.

From November 24, 2010 to present, BJM has been in Michigan with Princess (Stipulated Facts at ¶ 16) and has been attending Laurus Academy.   By all accounts, BJM has performed well academically at Laurus Academy.

On December 1, 2010, Princess initiated divorce and custody proceedings in the United States.  Although she was aware that Brian had initiated custody proceedings in Canada in November, Princess signed an Affidavit stating that she had "no information" regarding other custody proceedings concerning BJM.

On December 8, 2010, Brian filed a Hague application in Canada.  On March 11, 2011,

10

Brian initiated this action.

CONCLUSIONS OF LAW

1.    <u>It Is Undisputed That BJM Is Currently In The United States, That The Treaty Is In Force Between The United States And Canada, And That BJM Is Under The Age Of Sixteen.</u>

It is undisputed that the minor child, BJM, is presently in the United States.

The parties agree that both Canada and the United States are signatories to the Hague Convention.  *See also Miller v. Miller*, 240 F.3d 392, 395 n.1 (4th Cir. 2001); *Yang v. Tsui*, 416 F.3d 199, 201 (3rd Cir. 2005); *De Silva v. Pitts, 481* F.3d 1279, 1283 n.2 (10th Cir. 2007). Thus, the Treaty is in force between Canada and the United States.

The parties also agree that BJM was born in 2004 and she is therefore under the age of sixteen years old.

2.    <u>BJM Was Wrongfully Removed And Retained By Princess.</u>

Under Article 3 the Convention, Princess's removal and retention of BJM in the United States is wrongful if Brian can establish, by a preponderance of the evidence, that: 1) Canada was BJM's habitual residence immediately before the removal or retention; 2) Brian has rights of custody; and 3) Brian was exercising his custody rights.  Hague Convention, Article 3; *see also Friedrich*, 983 F.3d at 1400.

Here, it is undisputed that Brian has custody rights and that Brian was exercising his custody rights.[3]  Thus, the Court must determine whether Canada was BJM's habitual residence

_____

[3]Moreover, even if Princess had disputed whether Brian had custody or was exercising his custody rights, the evidence presented at the April 14, 2011 hearing establishes that Brian had custody rights and was exercising those rights.

11

immediately prior to the removal.

Before the Court can determine the child's habitual residence, the Court must first ascertain the date of the alleged wrongful removal or retention.  This is because the date of the alleged wrongful removal or retention is used to fix the time period available for assessing what country is the child's habitual residence.  Hague Convention, Article 3; *Jenkins v. Jenkins*, 569 F.3d 549, 556-57 (6th Cir. 2009); *McKie v. Jude*, 2011 WL 53058 (E.D. Ky. 2011).

Here, Brian alleges that BJM was wrongfully removed from Canada on September 7, 2010, and that she has been wrongfully retained by Princess in the United States since that time. Thus, the Court must determine BJM's habitual residence immediately prior to her removal on September 7, 2010.

The Hague Convention does not define the term "habitual residence."  *Friedrich,* 983 F.2d at 1400.   The Sixth Circuit has stated that"there is no real distinction between ordinary residence and habitual residence."  *Id.* at 1401.

According to the Sixth Circuit, a "person can have only one habitual residence."  *Id.* "On its face, habitual residence pertains to customary residence prior to the removal.  The Court must look back in time, not forward."  *Id.*  Moreover, "[t]o determine the habitual residence, the court must focus on the child, not the parents, and examine past experience, not future intentions."  *Id.*

"A child's habitual residence is the nation where, at the time of their removal, the child has been present long enough to allow acclimatization, and where this presence has a 'degree of settled purpose from the child's perspective.'"  *Robert v. Tesson*, 507 F.3d 981, 993 (6th Cir. 2007).   There are several factual circumstances which a court should consider in determining whether or not a child's stay in a new country meets the tests of "acclimatization," and "settled

12

purpose." *Id.* at 996.  Among such factors, academic activities are "among the most central."  *Id.* Other factors to be considered include participation in sports programs and excursions and meaningful connections with the people and places in the child's new country.  Courts have also considered whether the child brought more personal belongings with her to the new country than usual as evidence of a settled purpose to reside in the new country.

Here, Brian has established by a preponderance of the evidence that Canada was BJM's habitual residence immediately prior to her removal on September 7, 2010.

BJM was born in Canada.  In the fall of 2008, Brian, Princess, and Linda all verbally agreed that BJM would reside at the 450 Superior Residence in LaSalle during the school year and attend school there.  In addition, in October of 2008, Brian, Princess, and Linda formalized that agreement by executing a written "Parenting Agreement" wherein they all agreed that Brian, Princess, and Linda would have joint custody of BJM and that BJM "shall have her *primary residence* in the home of the Aunt at 450 Superior Street LaSalle, Ontario."  (Pet.'s Ex. 2) (emphasis added).

BJM was enrolled in junior kindergarten at Sandwich West Public School in LaSalle on November 3, 2008, and attended the remainder of the 2008-2009 school year there, while residing at the 450 Superior Residence.  Once the 2008-2009 school year ended, BJM spent the summer months (mid-June 2009 through the end of August, 2009), with Princess in Michigan.

That same plan was followed for the 2009-2010 school year.   In September of 2009, BJM returned to LaSalle to live with Brian and attend school at Sandwich West Public School. BJM attended the entire school year at Sandwich West Public School, while residing with Brian and Linda at the 450 Superior Residence.

Thus, for BJM's first two years of school, she attended school in Canada while residing with her father at the 450 Superior Residence during the school years and spent only the summer months visiting her mother in the United States. Indeed, Respondent has stipulated that Canada was BJM's habitual residence as of June, 2010. (*See* 4/14/11 Tr.).

After the end of her senior kindergarten school year, in June, 2010, BJM came to Michigan to stay with her mother for the summer – as she had done the two previous years. When BJM left Canada for the summer, she did not take her personal belongings with her. That is, her toys and the majority of her clothes remained in her bedroom at the 450 Superior Residence. Moreover, while living in Canada, BJM participated in extracurricular activities such as cheerleading. Before leaving to visit her mother for the summer in June, 2010, BJM participated in tryouts in order to be on the cheerleading squad again for the 2010-2011 school year and ordered a uniform.

Based on the evidence presented, this Court finds that Canada was BJM's habitual residence prior to her removal on September 7, 2010,[4] and that the removal was wrongful under the Hague Convention.

3.   <u>Respondent Has Not Met Her Burden Of Establishing A Defense Under The Hague Convention.</u>

Once this Court determines that the removal or retention was wrongful, the child must be

---

[4]Canada was also BJM's habitual residence as of November 24, 2010. The fact that Princess had retained BJM in Michigan between her initial removal on September 7, 2010, and her subsequent removal on November 24, 2010, did not alter her habitual residence. *See Friedrich,* 983 F.2d at 1401-02 (Noting that the "change in geography must occur before the questionable removal" and explaining that if the court were to determine that by removing the child from his habitual residence without the father's consent the mother "altered" the child's habitual residence, that "would render the Convention meaningless.")

14

returned unless the defendant can establish one of the narrow defenses under the Hague

Convention.  Hague Convention, Articles 12, 13a, and 13b; *Friedrich*, 983 F.3d at 1400.

      a.    <u>Respondent Has Not Established By A Preponderance Of The Evidence That</u>
              <u>Brian Consented To Or Subsequently Acquiesced In The Removal Or Retention</u>
              <u>Of BJM.</u>

The narrow defenses to removal include that "the person seeking return of the child

consented to or subsequently acquiesced in the removal or retention."  *Friedrich*, 78 F.3d at

1067; Hague Convention, Article 13a.

"Article 13a provides a defense to an action for return if the petitioner 'consented to or

subsequently acquiesced in the removal or retention' of the child.   The Convention does not

define consent or acquiescence in any more definite manner, and there is no statement to guide

[courts] in the text or legislative history of the Act."  *Friedrich*, 78 F.3d at 1069 n.11; Hague

Convention, Article 13a.

In *Friedrich,* the Sixth Circuit narrowly construed this defense, stating that "[e]ach of the

words and actions of a parent during the separation are not be scrutinized for a possible waiver of

custody rights."  *Id.* at 1070.  The court concluded that "acquiescence under the Convention

requires either: an act or statement with the requisite formality, such as testimony in a judicial

proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence

over a significant period of time."  *Friedrich*, 78 F.3d at 1070.

Here, Princess has not presented any evidence to establish that Brian consented by virtue

of an action or statement with requisite formality, such as testimony in a judicial proceeding.  To

the contrary, Brian initiated legal proceedings in both Canada and the United States in order to

retain custody of BJM.

Moreover, although the couple had previously executed a written agreement that BJM would attend school in Canada while residing at the 450 Superior Residence, there is no evidence to establish that the couple executed any subsequent written agreements regarding any changes in custody, schools, or BJM's primary residence.  There is no evidence to establish that Brian signed any written renunciation of rights to custody.

Accordingly, in order to prevail on this defense, Princess must establish, by a preponderance of the evidence, that Brian had a "consistent attitude of acquiescence over a significant period of time."  Princess has not met that burden.

Although Brian was aware that Princess wanted BJM to attend school in Michigan and begin living with her during the 2011-2012 school year, there is no evidence to indicate that Brian consented or agreed to that. Indeed, Princess herself testified that Brian knew of her desire that BJM attend Laurus Academy in Michigan but that Brian "never said yes or no."

Other actions by the parties also belie Princess's argument that Brian consented to BJM attending school in Michigan or living with Princess during the school year.  Those actions include the fact that on September 7, 2011, Brian took BJM to Sandwich West Public School for her first day of her first grade school year.  After Princess came to Canada on September 7th and took BJM to Michigan, Brian promptly sought legal advice and began taking legal action to establish and protect his custody rights in Canada.

A "primary purpose of the Convention is to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court." *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993).  That is precisely what occurred here.

As of November 24, 2010, Princess was aware that Brian had initiated custody

16

proceedings in Canada. Despite that knowledge, she came to Canada and, with the assistance of others, removed BJM from Canada under circumstances that reflect that she was aware that Brian *did not* consent to BJM leaving the country. Indeed, Princess testified that she obtained BJM from Brian's sister's house in the manner that she did because she knew that Brian would not agree to let BJM leave the country with her.

Upon learning that Princess had taken BJM on November 24, 2010, Brian immediately contacted border control, to try to prevent Princess from taking BJM across the United States-Canadian border. Brian also went to the LaSalle police station on November 24, 2010 and told the LaSalle police that BJM had been removed from Canada by Princess without his consent.

After returning to the United States with BJM, Princess then stayed at a friend's house for a period of two weeks and did not inform Brian, or anyone in his family, where they were. On December 1, 2010, Princess initiated divorce and custody proceedings in the United States. Although she was aware that Brian had initiated custody proceedings in Canada in November, Princess signed an Affidavit stating that she had "no information" regarding other custody proceedings concerning BJM.

On December 8, 2010, Brian filed a Hague application in Canada. On March 11, 2011, Brian initiated this action.

Brian did not consent or acquiesce to the removal and retention of BJM.

b.      Respondent's "Equitable Estoppel" Defense Fails As A Matter Of Law.

In Respondent's Answer and at the April 6, 2011 Status Conference, Princess asserted, as an affirmative defense, that "[e]quitable estoppel bars the Father from relief in this cause of action." (Docket Entry No. 16 at 12; Docket Entry No. 18).

17

The case law in the Sixth Circuit, however, reflects that if a Petitioner establishes that removal or retention was wrongful, "the child *must* be returned unless" the defendant can establish one of the narrow defenses that are expressly provided for in the Hague Convention. *Friedrich*, 78 F.3d at 1067 (emphasis added). "Equitable estoppel" is simply not one of the narrow defenses set forth in the Hague Convention. Respondent has not supplied the Court with any legal authority to show that this Court has the authority to decline to order the child returned based on a theory of equitable estoppel. Accordingly, this Court rejects this proffered defense as a matter of law.

     c.     <u>The "Well-Settled" Defense Does Not Apply In This Action Because The Removal Proceeding Was Not Commenced More Than One Year After The Removal.</u>

One of the defenses to removal set forth in the Hague Convention is that "the removal proceeding was commenced more than one year after the removal and the child has become settled in the new environment." Hague Convention, Article 12; *Friedrich*, 983 F.3d at 1400.

Respondent did not assert this "well-settled" defense in her Answer and Affirmative Defenses to the Petition. In addition, Respondent's Counsel did not raise the well-settled defense as a contested issue for the Court to determine.

Nevertheless, Respondent's Counsel made certain statements at the hearing, and during oral argument, that could be construed as asserting this defense to removal.

Under the express terms of the Hague Convention, however, the well-settled defense is only available to a Respondent in instances where the removal proceeding was "commenced more than one year after the removal." *Id*. Here, the removal occurred on September 7, 2010, and the Petition was filed on March 11, 2011. Thus, the removal proceeding was not commenced

18

more than one year after the removal and the well-settled defense does not apply here.

CONCLUSION

For the reasons set forth above, IT IS ORDERED that the Petition is GRANTED.  The

Court shall issue an appropriate order directing the return of BJM to Canada forthwith.


S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  April 15, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on
April 15, 2011, by electronic and/or ordinary mail.


S/Jennifer Hernandez
Case Manager